FILED

2011 FEB 28 P 2: 55

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**LAW OFFICE OF LAURENCE O. MASSON**
Laurence O. Masson (CSBN 87794)
2625 Alcatraz Avenue, # 206
Berkeley, California 94705-2702
Telephone: 510.735.9691
Facsimile: 510.735.9693
lomlex@gmail.com

E-filing

**MEDICAL LEGAL CONSULTANTS OF WASHINGTON**
Ralph D. Pittle, Esq.
8201 164th Ave. NE, Ste. 200
Redmond, WA 98052
Tel: (800) 767-2403
Fax: (888) 788-0568
rpittle@mlcofea.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JCS

Case No.:

CV11 0934

Hellen Amonds, an individual; Carolin Atkinson, an individual; Jerry Ault, an individual; Benito Balderas, an individual; Kathy Baldwin, an individual; Dale Beard, an individual; Amy Beard, an individual and as guardian of Dale Keith Beard, Jr.; Dominik Becker, an individual; Kristina Becker an individual and as guardian of Dominik Becker; Breanna Belcher, an individual; Kandie Laferty, an individual and as guardian of Breanna Belcher; Donald Benton, an individual; Kathy Bingham, an individual; George Bower, Jr., an individual; Melody Brockhage, an individual; Pansy Browning, an individual; Elwin L. Bullard, II, an individual; , Elizabeth Bushart, an individual; Jeffrey Buskirk, an individual; Jodi Camarillo, an individual; Marcella Coles, an individual; Linda Conley, an individual; Max DeVoe, an individual; Ingrid Dupuy, an individual; Dale Farmer, an individual; Joan Ferraro,

**COMPLAINT FOR DAMAGES AND**

**DEMAND FOR A JURY TRIAL:**

1. **STRICT PRODUCT LIABILITY – FAILURE TO WARN;**
2. **NEGLIGENCE);**
3. **FRAUD (Wyeth);**
4. **DECEIT BY CONCEALMENT (Wyeth)**
5. **NEGLIGENT MISREPRESENTATION (Wyeth)**
6. **BREACH OF IMPLIED WARRANTY;**
7. **BREACH OF EXPRESS WARRANTY;**
8. **VIOLATION OF Bus. & Prof. Code 17200;**

1

*Complaint for Damages*



an individual; Clarice Glaze, an individual; Patricia Goss, an individual; Richard Grant II, an individual; Jan Gray, an individual; Julia Greer, an individual; Kimberly Hanson, an individual; Lynda Liem, an individual; Gary Lutes, an individual; Samica Lynon, an individual; William Massey, an individual; Lovie Miller, an individual; Sue Miniard, an individual; Perry Moorer, an individual; Dorothy Mulkey, an individual; Karen Mullins, an individual; Charles Nagy, an individual; Marlou Ordelt, an individual; Robert Pike, an individual; Patricia Richey, an individual; Arlene Rogers, an individual; Walter Ryskiewicz, an individual; Michelle Schwartz, an individual; Jana Smith, an individual; Stefanie Sodermark, an individual; Lorraine Spencer, an individual; Betty Struck, an individual; Nikki Wright, an individual;, David Yoder, an individual; and Jeannine Zitney, an individual.

    Plaintiffs,

   vs.

McKesson Corporation, a Delaware corporation;

Wyeth Pharmaceuticals Inc., Individually and d/b/a ESI Lederle, Inc., a Delaware corporation;

Wyeth Inc., a Delaware corporation;

Wyeth LLC, a Delaware limited liability company;

Pfizer, Inc., a Delaware corporation; Schwarz Pharma, Inc., a Delaware corporation;

Schwarz Pharma AG, a foreign corporation;

UCB GmbH d/b/a Schwarz Pharma AG, a

2

*Complaint for Damages*

foreign corporation;

Alaven Pharmaceutical LLC, a Delaware corporation;

Teva Pharmaceuticals USA, Inc., a Delaware corporation;

Teva Pharmaceutical Industries, Ltd., a foreign corporation;

PLIVA, Inc., a New York corporation;

PLIVA d.d. , a foreign corporation;

Barr Pharmaceuticals, LLC f/k/a Barr Pharmaceuticals, Inc., a Delaware corporation;

Actavis Elizabeth LLC, Individually and d/b/a Purepac Pharmaceuticals, a New Jersey corporation;

Actavis Group hf, a foreign corporation; APP Pharmaceuticals, LLC, Individually and d/b/a Abraxis Pharmaceuticals, a Delaware corporation;

and, DOES 1 through 100 inclusive,

        Defendants.

Plaintiffs Hellen Amonds, an individual; Christine Atkinson, an individual; Jerry Ault, an individual; Benito Balderas, an individual; Kathy Baldwin, an individual; Dale Beard, an individual; Amy Beard, an individual and as guardian of Dale Keith Beard, Jr.; Dominik Becker, an individual; Kristina Becker an individual and as guardian of Dominik Becker; Breanna Belcher, an individual; Kandie Laferty an individual and as guardian of Breanna Belcher; Donald Benton, an individual; Kathy Bingham, an individual; George Bower, Jr., an individual; Melody Brockhage, an individual; Pansy Browning, an individual; Elwin L.

Bullard, II, an individual; , Elizabeth Bushart, an individual; Jeffrey Buskirk, an individual; Jodi Camarillo, an individual; Marcella Coles, an individual; Linda Conley, an individual; Max DeVoe, an individual; Ingrid Dupuy, an individual; Dale Farmer, an individual; Joan Ferraro, an individual; Clarice Glaze, an individual; Patricia Goss, an individual; Richard Grant II, an individual; Jan Gray, an individual; Julia Greer, an individual; Kimberly Hanson, an individual; Lynda Liem, an individual; Gary Lutes, an individual; Samica Lynon, an individual; William Massey, an individual; Lovie Miller, an individual; Sue Miniard, an individual; Perry Moorer, an individual; Dorothy Mulkey, an individual; Karen Mullins, an individual; Charles Nagy, an individual; Marlou Ordelt, an individual; Robert Pike, an individual; Patricia Richey, an individual; Arlene Rogers, an individual; Walter Ryskiewicz, an individual; Michelle Schwartz, an individual; Jana Smith, an individual; Stefanie Sodermark, an individual; Lorraine Spencer, an individual; Betty Struck, an individual; Nikki Wright, an individual; David Yoder, an individual; and Jeannine Zitney, an individual (hereinafter referred to individually and jointly as "Plaintiff") by and through counsel, for the Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1.    Each Plaintiff herein is a competent individual over the age of 18 or represented by a guardian ad litem, is a resident of the United States and hereby submits to the jurisdiction of this Court and alleges that venue in this Court is proper for this case.

2.    At all relevant times alleged herein, one or more of the Defendants was, and now is, a corporation with its principal place of business in the State of California.

3.    At all relevant times alleged herein, one or more of the individual Defendants was, and now is a resident of the State of California.

4.    At all relevant times alleged herein, the Defendants were in the business of researching, designing, developing, licensing, compounding, testing, producing, manufacturing, assembling, processing, packaging, inspecting, labeling, warranting,

4

*Complaint for Damages*

marketing, promoting, advertising, distributing, selling, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the drug metoclopramide, marketed and known as Reglan® (hereinafter referred to as "REGLAN") and in the generic form as metoclopramide (hereinafter referred to as "metoclopramide"). REGLAN and generic metoclopramide are sometimes hereinafter referred to individually as "PRODUCT" and collectively as the "PRODUCTS". Plaintiffs are individuals who suffered damages as a result of use of the PRODUCTS.

5.     At all times relevant hereto, Defendants designed, developed, manufactured, promoted, marketed, distributed, tested, warranted and sold the PRODUCTS in interstate commerce throughout the United States including, inter alia, San Francisco County, California. Furthermore, Defendants conducted substantial business, advertised the PRODUCTS, received substantial compensation and profits from sales of the PRODUCTS, made material omissions and misrepresentations, and committed breaches of warranties throughout the United States including, inter alia, San Francisco County, California.

6.     At all times relevant hereto, Defendants, and each of them, were engaged in the business of researching, designing, developing, licensing, compounding, testing, producing, manufacturing, assembling, processing, packaging, inspecting, labeling, warranting, marketing, promoting, advertising, distributing, selling, and introducing the PRODUCTS into interstate commerce, either directly or indirectly through third parties or related entities.

7.     Defendant MCKESSON CORPORATION is a Delaware corporation with its principal place of business in California.  Defendant regularly conducts business in San Francisco County, California.  Defendant was involved in the distribution, marketing, sale, labeling, and design of the PRODUCTS detailed below.  Plaintiff is informed and believes Defendant distributed the PRODUCT that was dispensed to Plaintiff.  Defendant may be served with process by and through its registered agent for service: The Prentice Hall Corporation System. 2730 Gateway Oaks Dr., Ste 100, Sacramento, CA 95833.

8.     Defendant WYETH PHARMACEUTICALS INC., Individually and d/b/a ESI LEDERLE, INC. is a Delaware corporation with a principal place of business at 5 Giralda Farms, Madison, New Jersey 07940. Defendant regularly conducts business in San Francisco County, California. Defendant was involved in the manufacture, distribution, marketing, sale, labeling, and design of PRODUCT detailed below. Defendant's agent for service of process is C.T. Corporation 1209 Orange Street, Wilmington, DE 19801.

9.     Defendant PFIZER, INC. is a Delaware corporation with a principal place of business in New York City, New York. Defendant regularly conducts business in San Francisco County, California. In October 2009, Defendant acquired Defendants Wyeth LLC and Wyeth Pharmaceuticals, Inc. and therefore acquired Defendants' tort liabilities. Defendant's agent for service of process is CT Corporation System, 818 West Seventh Street, Los Angeles, CA 90017.

10.    Defendant SCHWARZ PHARMA, INC. is a Delaware corporation with a principal place of business in Georgia. Defendant regularly conducts business in San Francisco County, California. Defendant was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCT detailed below. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant's agent for service of process is Corporate Service Co., 2711 Centerville Road, #400, Wilmington, DE 19808

11.    Defendant SCHWARZ PHARMA AG is a foreign corporation with its principal place of business in Germany. Defendant Schwarz Pharma AG is the parent company of Defendant Schwarz Pharma, Inc. and therefore liable for any and all tort liabilities of Defendant Schwarz Pharma, Inc. In addition, Defendant Schwarz Pharma AG was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCT detailed below. Defendant regularly conducts business in San Francisco County, California. Defendant may be served with process via The Hague Convention by serving Germany's Central Authority at: Die Präsidentin des Oberlandesgerichts Düsseldorf,

6

Cecilienallee 3, 40474 Düsseldorf, Germany.

12. Defendant UCB GmbH is a foreign corporation with its principal place of business in Belgium. Defendant UCB GmbH owns 99% of Defendant Schwarz Pharma AG and therefore is liable for any and all tort liabilities of Defendants Schwarz Pharma, Inc. and Schwarz Pharma AG. In addition, Defendant UCB GmbH was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCT detailed below. Defendant regularly conducts business in San Francisco County, California. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process via The Hague Convention by serving Belgium's Central Authority at: Service d'entraide internationale en matière civile, Boulevard de Waterloo, 115, 1000 BRUXELLES, Belgique.

13. Defendant ALAVEN PHARMACEUTICAL LLC is a Delaware corporation with a principal place of business in Marietta, Georgia. Defendant regularly conducts business in San Francisco County, California. Defendant was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCT. Defendant may be served with process by registered mail, return receipt requested, upon: Henninger S. Bullock, Esquire, MAYER BROWN LLP, 1675 Broadway, New York, NY 10019.

14. Defendants Wyeth LLC, Wyeth Pharmaceuticals, Inc., Pfizer, Inc., Schwarz Pharma, Inc., Schwarz Pharma AG, UCB GmbH, and Alaven Pharmaceutical LLC, are hereinafter referred to collectively as "BRAND NAME DEFENDANTS".

15. Defendant TEVA PHARMACEUTICALS USA, Inc., Individually and d/b/a IVAX Pharmaceuticals, is a Delaware corporation with a principal place of business in Pennsylvania. Defendant regularly conducts business in San Francisco County, California. Defendant is a subsidiary or division of Teva Pharmaceutical Industries, Ltd., a corporation organized, existing and doing business under and by virtue of the laws of Israel, headquartered in Petach Tikvah, Israel. Defendant was involved in the manufacture, distribution, marketing, sale, labeling, and design of the PRODUCTS detailed below.

7

*Complaint for Damages*

Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process by registered mail, return receipt requested, upon: Ms. Jennifer Fuller-Ricciardi, Teva Pharmaceuticals USA, Inc., 425 Privet Road, P.O. Box 1005, Horsham, PA 19044.

16.     Defendant TEVA PHARMACEUTICAL INDUSTRIES, LTD. is a foreign corporation with its principal place of business in Israel. Defendant Teva Pharmaceutical Industries, Ltd. is the parent company of Defendant Teva Pharmaceuticals USA, Inc. and therefore liable for any and all tort liabilities of Defendant Teva Pharmaceuticals USA, Inc. In addition, Defendant Teva Pharmaceutical Industries, Ltd. was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCTS detailed below. Defendant regularly conducts business in San Francisco County, California. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process via The Hague Convention by serving Israel's Central Authority at: The Director of Courts, Directorate of Courts, 22 Kanfei Nesharin St., Jerusalem 95464, P.O.B. 34142, Israel.

17.     Defendant PLIVA, Inc. is a New York corporation with a principal place of business in New Jersey. Defendant is a subsidiary or division of PLIVA d.d., a corporation organized, existing and doing business under and by virtue of the laws of the Republic of Croatia, headquartered in Zagreb, Croatia. PLIVA d.d., is a wholly owned subsidiary of Defendant Barr Pharmaceuticals LLC as a result of Barr's acquisition of Pliva in 2006. Because Barr Pharmaceuticals LLC was later acquired by Teva Pharmaceuticals USA, Inc., Pliva, Inc. is now a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc. Defendant regularly conducts business in San Francisco County, California. Defendant was involved in the manufacture, distribution, marketing, sale, labeling, and design of the PRODUCTS. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process by registered mail, return receipt requested, upon: Ms. Jennifer Fuller-Ricciardi, Teva Pharmaceuticals USA, Inc., 425

Privet Road, P.O. Box 1005, Horsham, PA 19044.

18. Defendant PLIVA d.d. is a foreign corporation with its principal place of business in Croatia. Defendant PLIVA d.d. is the parent company of Defendant PLIVA, Inc. and therefore liable for any and all tort liabilities of Defendant PLIVA, Inc. In addition, Defendant PLIVA d.d. was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCTS detailed below. Defendant regularly conducts business in San Francisco County, California. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process via The Hague Convention by serving Croatia's Central Authority at: Ministry of Justice of the Republic of Croatia, Dezmanova 6 I 10, Croatia.

19. Defendant BARR PHARMACEUTICALS, LLC f/k/a BARR PHARMACEUTICALS, INC. is a Delaware corporation with its principal place of business in New Jersey. Defendant Barr Pharmaceuticals LLC was acquired by Defendant Teva Pharmaceuticals USA, Inc. on December 23, 2008 and is therefore a wholly owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc. Defendant Barr Pharmaceuticals LLC was involved in the manufacture, distribution, marketing, sale, and labeling of the PRODUCTS detailed below. Defendant regularly conducts business in San Francisco County, California. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process by and through its principal office at: 225 Summit Ave., Montvale, New Jersey 07645.

20. Defendant ACTAVIS ELIZABETH LLC, Individually, and d/b/a PUREPAC PHARMACEUTICALS is a New Jersey corporation with a principal place of business in New Jersey. Defendant regularly conducts business in San Francisco County, California. Defendant was involved in the manufacture, distribution, marketing, sale, labeling, and design of the PRODUCTS detailed below. Plaintiff is informed and believes Defendant manufactured the PRODUCT that was dispensed to Plaintiff. Defendant may be served with process by registered mail, return receipt requested, upon: Walter "Pete" Swayze, III,

9

*Complaint for Damages*

1
2  Esquire, SEGAL,MCCAMBRIDGE, SINGER &MAHONEY, LTD., 30 South 17th Street,
3  Suite 1700, Philadelphia, PA 19103.

4  21.  Defendant ACTAVIS GROUP HF is a foreign corporation with its principal
5  place of business in Iceland.  Defendant Actavis Group hf is the parent company of
6  Defendant Actavis Elizabeth LLC, Individually, and d/b/a Purepac Pharmaceuticals and
7  therefore liable for any and all tort liabilities of Defendant Actavis Elizabeth LLC,
8  Individually, and d/b/a Purepac Pharmaceuticals. In addition, Defendant Actavis Group hf
9  was involved in the manufacture, distribution, marketing, sale, and labeling of the
10  PRODUCTS detailed below.  Defendant regularly conducts business in San Francisco
11  County, California.  Plaintiff is informed and believes Defendant manufactured the
12  PRODUCT that was dispensed to Plaintiff.  Defendant may be served with process via The
13  Hague Convention by serving Iceland's Central Authority at: Ministry of Justice and Human
14  Rights, Skuggasundi, 150 Reykjavik, Iceland.

15  22.  Defendants Wyeth, Inc., Wyeth LLC, Wyeth Pharmaceuticals, Inc., Pfizer,
16  Inc., Schwarz Pharma, Inc., Schwarz Pharma AG, UCB GmbH, and Alaven Pharmaceutical
17  LLC are sometimes hereinafter referred to collectively as "BRAND NAME
   DEFENDANTS".
18
19  23.  Defendants Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries,
20  Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis
   Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100,
21  inclusive, are sometimes referred to hereinafter collectively as "the GENERIC DRUG
22  COMPANY DEFENDANTS".
23
24  24.  Defendants Wyeth, the BRAND NAME DEFENDANTS and the GENERIC
25  DRUG COMPANY DEFENDANTS are sometimes referred to hereinafter collectively as the
   "DRUG COMPANY DEFENDANTS."
26
27  25.  The true names or capacities, whether individual, corporate, or otherwise, of
28  Defendants DOES 1 through 100, inclusive, are unknown to Plaintiff who therefore sues

10
*Complaint for Damages*

said Defendants by such fictitious names. Plaintiff believes and alleges that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

26.     At all times herein alleged, "Defendants" include all herein named Defendants as well as Defendants DOES 1 through 100, inclusive.

27.     At all times herein alleged, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and joint venturer of each of the remaining Defendants herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to Plaintiff.

28.     There exists, and at all times herein alleged, there existed, a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter-ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as an entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

29.     At all times herein alleged, the officers and directors of the Defendants named herein participated in, authorized and directed the production and promotion of the PRODUCTS when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the PRODUCTS and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff.

30.     DOES 1 through 100, and each of them, acted independently of, or jointly with, other Defendants, and are all in some manner legally responsible for the events and happenings herein referred to, and caused damages proximately and foreseeably to Plaintiff

as alleged herein.

31.     Plaintiff used the PRODUCTS as prescribed and sustained injuries and damages as a result thereof.

32.     Plaintiff's injuries were caused by defects in the PRODUCTS and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants. As a result of Defendants' claims and representations regarding the effectiveness and safety of the PRODUCTS, Plaintiff was prescribed the PRODUCTS and used and consumed the PRODUCTS in accordance with the directions of Plaintiff's physician. Had the Defendants properly disclosed risks associated with the PRODUCTS, Plaintiff would not have used them and would not have suffered the serious and permanent injuries as described herein.

33.     Prior to the Plaintiff's use of the PRODUCTS, Defendants knew or should have known that the prolonged use of the PRODUCTS created a higher risk of movement disorders, including Tardive Dyskinesia, and that when used as directed, the PRODUCTS were and are unreasonably dangerous to consumers.

34.     Therefore, at the time Plaintiff used the PRODUCTS, Defendants knew or should have known that the PRODUCTS created an increased risk to consumers of serious personal injury including, but not limited to debilitating movement disorders including, but not limited, to Tardive Dyskinesia.

35.     Despite the fact that Defendants knew or should have known of the serious health risks associated with the use of the PRODUCTS, the Defendants that manufactured or distributed the PRODUCTS which Plaintiff consumed failed to warn the Plaintiff, or health care providers of said serious risks before Plaintiff used the PRODUCTS.

36.     Defendant Wyeth misled Plaintiff's health care providers.

37.     Had Defendant Wyeth not misled Plaintiff's health care providers Plaintiff's health care providers would not have prescribed the PRODUCTS in the manner by which it was prescribed for Plaintiff and Plaintiff would not have used the PRODUCTS in a manner that caused Plaintiff's injuries.

38.   Had Plaintiff, or Plaintiff's health care providers known the risks and dangers associated with the PRODUCTS, Plaintiff would not have used the PRODUCTS and would not have suffered serious injuries and consequent bodily impairment.

## Allegations of Fact

39.   At all relevant times up to approximately the end of 2001, defendant WYETH (as the A.H. Robins Company and/or American Home Products Corporation and/or by some other name) marketed and manufactured and/or distributed a certain name brand prescription drug product known as Reglan.

40.   The term "Reglan" is the brand name for a drug known generically as metoclopramide, or metoclopramide hydrochloride or metoclopramide HCl, terms which also refer to the drug substance that is the sole active ingredient in Reglan.

41.   Reglan®/metoclopramide is a prescription medication classified as a gastrointestinal stimulant, antiemetic and dopamine antagonist.  The drug can come in the form of a tablet (5mg/10mg), an injection, or syrup.

42.   At all relevant times, Defendants Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100marketed and manufactured and/or distributed generic drug products known variously by such names as "injectable generic metoclopramide" and/or "metoclopramide syrup" and/or "metoclopramide tablets." These Defendants are referred to hereinafter as "the GENERIC DRUG COMPANY DEFENDANTS."

43.   These generic metoclopramide products contain the same active ingredient (i.e., drug substance) as Reglan, and are equivalent to Reglan products in dosage, strength, and all other therapeutically material respects, including potentially beneficial effects and potentially harmful side effects, and differ from Reglan only in therapeutically non-relevant respects such as color, shape, inactive ingredients, and source of manufacture.

13

*Complaint for Damages*

44.     The terms "Reglan" and "metoclopramide" are both frequently and interchangeably employed, in common usage in the medical community, to refer to all or any of the metoclopramide products, including both the name brand products (Reglan) and their generic equivalents. (Hereinafter the term "Reglan" is employed to refer to the name brand product; "generic metoclopramide" to refer to the generic equivalent drug products; "PRODUCT" and/or "PRODUCTS" to refer to the name brand and generic drug products both; and "metoclopramide" to refer to the drug substance, which is the active ingredient in all the PRODUCTS.)

45.     The PRODUCTS readily pass the blood brain barrier and enter the brain.  The effect typically causes involuntary, repetitive movements and motor restlessness.

46.     These involuntary movements are known as extrapyramidal symptoms (EPS), that include, but are not limited to, tardive dyskinesia, tardive dystonia, tardive akathisia, Parkinsonism, Neuroleptic Malignant Syndrome, and Reglan®-induced tremors.  The PRODUCTS have also been associated with central nervous system disorders, depression with suicidal ideation, visual disturbances, and memory loss.

47.     Tardive dyskinesia, tardive akathisia, and tardive dystonia are serious neurological movement disorders that result in the involuntary and uncontrollable movements of the head, neck, face, arms, and/or trunk, as well as, involuntary facial grimacing and tongue movements, including tongue thrusting, tongue chewing and/or other involuntary movements.

48.     There is no cure for any of these EPS disorders caused by the PRODUCTS.

49.     The PRODUCTS can also cause an aggravation in preexisting conditions.

50.     The link between neuroleptic drugs, such as the PRODUCTS, and involuntary movements has been known from as far back as 1973.[1]  Between 1973 and present day, dozens upon dozens of studies have specifically evidenced the direct connection between the

---

[1] Crane GE (September 1973). "Is tardive dyskinesia a drug effect?". *Am J Psychiatry* **130** (9): 1043–4.

14

*Complaint for Damages*

long term, pediatric, and/or short term use of the PRODUCTS and involuntary movement disorders.

51.     The PRODUCT is indicated for adult short-term therapy of symptomatic gastroesophageal reflux and acute and recurrent diabetic gastric stasis.

52.     The PRODUCT is indicated for treatment use of no greater than twelve (12) weeks in adults; however, the Defendant WYETH represented that the PRODUCT was safe for adult use to treat nausea and/or esophageal reflux for durations that exceeded twelve (12) weeks.

53.     At no point in time has the PRODUCT been deemed efficacious when used for long term treatment.

54.     As BRAND NAME DEFENDANTS and GENERIC DEFENDANTS knew, adult patients who used the PRODUCT for a longer period of time were at a significant and unreasonably dangerous increased risk of developing a severe and permanent neurological movement disorder.

55.     Defendant WYETH, with the intention of deceiving physicians and their patients, and to induce physicians to prescribe, and their patients to ingest, Reglan for prolonged periods of time, informed physicians, through the PDR and the dissemination of other materials, that exposure to metoclopramide can lead to tardive dyskinesia and other ESP, that the risk is "believed" to increase with duration of therapy and total cumulative dose, and that therapy for longer than 12 weeks "cannot be recommended," but knowingly concealed from the physicians material facts bearing on the interpretation of those disclosures, including the fact that earlier false information, disseminated by WYETH as the A. H. ROBINS COMPANY, and representing long term metoclopramide therapy to be reasonably safe, was false and without scientific foundation; that metoclopramide is a neuroleptic agent and dopamine antagonist, which can be expected to lead to tardive dyskinesia and other EPS with approximately the same high frequency, particularly in longer term use, as other dopamine antagonists and neuroleptic drugs; that epidemiological studies

15

*Complaint for Damages*

1

2  have consistently confirmed this expectation; and that the treatment of chronic or

3  intermittent heartburn or bloating with the PRODUCTS for longer than 12 weeks is unlikely

4  to be reasonably safe.

5  56.      The representations by WYETH as the A.H. ROBINS COMPANY and later

6  as AMERICAN HOME PRODUCTS CORPROATION were, in fact, false. The true facts

7  were that REGLAN and/or other metoclopramide products were not safe to be used for

8  periods in excess of 12 weeks and WYETH did not disclose or warn users and their

9  physicians about such known risks and side effects of Reglan and/or other metoclopramide

10  products.

11  57.      When the WYETH made these representations, they knew that such

12  representations were false. WYETH made the representations with the intent to defraud and

13  deceive the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific,

14  pharmaceutical and healthcare communities, the FDA, and the public in general, and with

15  the intent to induce them to use the products and act in the manner alleged in this complaint.

*Reglan®/Metoclopramide Ownership Background*

16  58.      A.H. Robins Company, Inc. gained approval for Reglan® injectable through

17  the United States Food & Drug Administration ("FDA") on or about February 7, 1979.

18  59.      A.H. Robins Company, Inc. gained approval for Reglan® tablets through the

19  United States Food & Drug Administration ("FDA") on or about December 30, 1980. A.H.

20  Robins Company, Inc. gained approval for Reglan® syrup through the United States Food &

21  Drug Administration ("FDA") on or about March 25, 1983.

22  60.      In 1989, Defendants Wyeth LLC and Wyeth Pharmaceuticals, Inc., which

23  were known at that time as American Home Products Corporation acquired all of the assets

24  and all of the liabilities (with the exception of Dalkon Shield liabilities) of the A.H. Robins

25  Company, Inc. ., a Debtor in Bankruptcy, and thereby became the successor-in-interest

26  responsible for all tort liabilities of A.H. Robins Company, Inc. related to Reglan.

27  61.      Defendant Pfizer, Inc. has since acquired all of the assets and all of the

28

16

*Complaint for Damages*

1
2 liabilities of Defendants Wyeth LLC and Wyeth Pharmaceuticals, Inc. and thereby became
3 the successor-in-interest responsible for all tort liabilities of Defendants Wyeth LLC and
4 Wyeth Pharmaceuticals, Inc.

5     62.    On or around December 27, 2001, Defendant Schwarz Pharma, Inc. purchased
6 from Defendants Wyeth LLC and Wyeth Pharmaceuticals, Inc., formerly known as
7 American Home Products Corporation, the rights, obligations and liabilities associated with
8 Reglan® tablets. Defendant Schwarz Pharma, Inc. became entitled to access to all of the
9 information and knowledge then possessed by Defendants Wyeth LLC and Wyeth
10 Pharmaceuticals, Inc., formerly known as American Home Products Corporation, concerning
11 Reglan®, metoclopramide HCl and/or metoclopramide, as more particularly alleged above.

12     63.    Subsequently, Defendant Alaven Pharmaceuticals, LLC purchased from
13 Defendant Schwarz Pharma, Inc. the rights and liabilities associated with Reglan®.

14     64.    Defendants Wyeth LLC and Wyeth Pharmaceuticals, Inc., formerly known as
15 American Home Products Corporation, sold the rights and liabilities associated with
16 Reglan® injectable to Baxter Healthcare Corporation on or about December 21, 2002.

17     65.    Defendants Morton Grove Pharmaceuticals, Inc. and Wockhardt USA are
18 currently the Referenced Listed Drug holders for Reglan® syrup.

19     66.    At the time of possession of the rights and liabilities of Reglan®, each
20 Defendant possessed the reference listed drug to which the generic version, metoclopramide,
21 was compared to in order to show bioequivalence.

*Promoting the Use of Reglan and Other Metoclopramide Products*

22     67.    As required by federal law for all prescription drug products, each of the
23 DRUG COMPANY DEFENDANTS included, in "package inserts" placed on or within the
24 containers from which the products (including "product samples," if any) were to be
25 dispensed, the product's "labeling," as approved by the federal Food and Drug
26 Administration (FDA). The labeling includes information on the product's active and
27 inactive ingredients, clinical pharmacology, "indications" and usage, contraindications,
28

17

*Complaint for Damages*

warnings, precautions, and side effects (adverse reactions and overdosage).

68.   The labeling for Reglan was developed initially by WYETH, as the A. H. Robins Company, prior to its merger into the wholly-owned WYETH subsidiary, and revised from time to time, after that merger and also after the subsidiary's subsequent corporate absorption into WYETH.

69.   Defendant WYETH (as the A.H. Robins Company, the American Home Products Corporation, and/or by other names) arranged for publication in the Physician's Desk Reference (PDR), for all years in which it distributed Reglan, the Reglan labeling (the verbatim content of the Reglan package insert) as a so-called "monograph" for the product.

70.   The PDR is (and at all relevant times, was) an annual compilation, updated semi-annually, composed of such "monographs," typically for name brand prescription drug products. The annual edition and the supplements are distributed free of charge to physicians in the United States and widely relied upon by physicians as a basic reference work for information about pharmaceutical products.

71.   WYETH knew that metoclopramide, as a dopamine antagonist and/or a neuroleptic drug substance, is as likely as other dopamine antagonists and/or other neuroleptic drugs to cause tardive dyskinesia and other EPS, particularly at higher exposures and longer durations of use. WYETH also knew that the Conditions for which Reglan would likely be prescribed—in particular bloating (such as that attending "diabetic gastroparesis") and heartburn (such as that attending "gastroesophageal reflux disease," or "GERD")—are often long-term chronic and/or intermittent conditions.

72.   Defendant WYETH (as A.H. Robins Company, Inc., prior to its merger into a wholly-owned Wyeth subsidiary corporation) chose to extend the duration of clinical trials (which are required by federal law) for evaluating the safety and efficacy of the drug Reglan to periods (as far as is reported) of not more than approximately 12 weeks.

73.   In order to increase sales, WYETH (as the A.H. Robins Company, Inc., prior to its merger into a wholly-owned Wyeth subsidiary corporation) undertook and sponsored

18

*Complaint for Damages*

1
2
3
4
5
6

the performance of investigations calculated to suggest, without a methodology adequate to scientifically support such results, that metoclopramide is safe for long-term use; wrote up the results of the investigations purporting to demonstrate that metoclopramide is safe for long-term use; and caused the write-up to be published as if the study were designed, performed, and written up by outside investigators.

7
8
9
10
11
12
13

74.     WYETH (as A.H. Robins Company, Inc., prior to its merger into a wholly-owned Wyeth subsidiary corporation), in connection with its promotion of Reglan use, also published and disseminated other information, in the Reglan labeling, through the PDR, and in other materials, to indicate or suggest that EPS side effects, and in particular tardive dyskinesia, are rare or "comparatively rare" with metoclopramide use, whether short-term or long-term, and systematically suppressed or downplayed contrary evidence about the risks, incidence, and prevalence of the side effects associated with metoclopramide.

14
15
16
17
18
19
20
21
22

75.     WYETH knew from its own investigations, including analysis of sales statistics acquired by the A.H. Robins Company, Inc., prior to its merger into a wholly owned subsidiary of Wyeth, and from scientific studies published in peer-reviewed medical journals, that many physicians (in particular, gastroenterology specialists and primary care physicians) were unaware of the extent of the risks posed by metoclopramide therapy at high dosages and/or long-term exposure, that many such physicians were over-prescribing metoclopramide products, and that many patients, who would not have developed these side effects but for their overexposure to metoclopramide, developed serious EPS side effects, including tardive dyskinesia and tardive dystonia.

23
24
25
26

76.     WYETH declined to make or propose any changes in the Reglan labeling or other promotional materials that would alert physicians to the risks of long term metoclopramide exposure, and continued to disseminate information to physicians which indicated or implied that metoclopramide was not unduly unsafe for long term therapy.

27
28

77.     Through published materials and other promotional efforts toward the introduction and widespread use of a metoclopramide product into the United States market,

19

*Complaint for Damages*

defendant WYETH (as the A. H. Robins Company, prior to its merger and subsequent absorption into WYETH) planted and cultivated, among physicians, the idea that long-term use of metoclopramide was both reasonably safe and effective, and since that time has profited from those efforts. Such promotions included presentations by sales representatives (known as "detail men") emphasizing the drug's gastroenterological effects, in particular gastric emptying, at the expense of its extrapyramidal effects; the sponsoring of talks and seminars with company sponsored speakers, who would discuss the supposed benefits and safety of longer term use; and the ghost-authoring, company-sponsored publication, and further dissemination of at least one junk science study calculated to "demonstrate" the safety of long-term metoclopramide use.

78.    Defendants WYETH and PFIZER have never repudiated or denounced the substance of these promotions nor acted to neutralize the effects of the promotions in spreading misinformation about metoclopramide side effects among the medical community.

79.    The package inserts for Reglan and for each of the generic metoclopramide products are (and at all relevant times, have been) materially identical, except for descriptions of therapeutically non-relevant differences among the products, such as color, shape, inactive ingredients, and source of manufacture.

80.    The acts of Defendant WYETH in issuing and perpetuating untrue and misleading statements in the package inserts and PDR monograph for the PRODUCTS as alleged herein are continuous and ongoing and the public, including Plaintiff will continue to suffer the harms herein alleged unless and until Defendant PFIZER takes steps to disclose and repudiate the misleading information initially disseminated by A.H. Robins Company, Inc., prior to its merger into a wholly owned subsidiary of WYETH, and perpetuated by Defendant WYETH.

81.    The GENERIC DRUG COMPANY DEFENDANTS adopted, as the package inserts for their own metoclopramide products, the verbatim content of the package insert for Reglan (as revised from time to time), modified only to reflect the therapeutically non-

20

*Complaint for Damages*

relevant differences, such as color, shape, inactive ingredients, and source of manufacture, among the therapeutically equivalent products.

82.     So-called "indicated uses" for the metoclopramide products, as reflected in the product labeling and in the PDR monograph for Reglan, included "short term (4 to 12 weeks) therapy for symptomatic gastroesophageal reflux" and "relief of symptoms associated with acute and recurrent diabetic gastroparesis." The text further disclosed that exposure to metoclopramide could cause extrapyramidal symptoms, including tardive dyskinesia and tardive dystonia, and other afflictions involving the central nervous system, and that the risk of developing tardive dyskinesia was "believed to increase with duration of treatment and total cumulative dose."

83.     At all relevant times, Defendants the DRUG COMPANY DEFENDANTS, and DOES 1-100 knew, or by the exercise of known scientific methods could have known, and, in the exercise of reasonable care toward patients who would be expected to ingest metoclopramide products, should have known, *inter alia*, that:

a)      Metoclopramide is a neuroleptic drug, classified as such (because of its effects on the central nervous system, specifically as a dopamine antagonist) with other neuroleptic drugs, which are also classified (because of their use in treating schizophrenia) as antipsychotic drugs.

b)      Specific neuroleptic drugs or dopamine antagonists, in the absence of contrary data specific to the drug, are expected to lead to tardive dyskinesia in a substantial percentage of patients who are exposed to the drug in usual therapeutic doses for periods of six months to a year or more.

c)      Clinical trials over periods longer than the periods for the Reglan clinical trials, namely up to three months, would reveal the effects of longer term cumulative exposure to metoclopramide specifically.

d)      The results of epidemiological studies, published in peer-reviewed

21

*Complaint for Damages*

scientific and medical literature, have consistently shown, for many years, a high prevalence of tardive dyskinesia and other EPS among metoclopramide product users, particularly those exposed to the drug for prolonged periods.

e)   These published epidemiological studies represent the best scientific evidence then available for evaluating the association between metoclopramide exposure and the prevalence or incidence of tardive dyskinesia and other EPS.

f)   Heartburn and gastric bloating are typically and often experienced chronically or intermittently over long periods of time.

g)   Neuroleptic drugs identified as such are commonly recognized, among internists, family and general practitioners, and gastroenterologists, as leading to a high incidence of tardive dyskinesia and related EPS when used for prolonged periods of six months to a year or more.

h)   Physicians commonly prescribe metoclopramide products, as treatment or relief for heartburn and bloating, for prolonged periods of six months to a year or more: nearly one-third of all patients who used metoclopramide products during one relevant period received it on doctor's prescriptions for 12 months or longer rather than 12 weeks or less.

i)   The package inserts for metoclopramide products, and the materially identical PDR monograph for Reglan, contained false and/or misleading statements and omitted information material to the foreseeable and ordinary contemplated uses of the products. These statements and omissions include: The statement that the most common EPS occurred in approximately 1 in 500 hundred patients using metoclopramide products. This asserted fact is without scientific

22

*Complaint for Damages*

evidence of any sort capable of supporting it.

j) The statement that "Like the phenothiazines and related drugs which are also dopamine antagonists, metoclopramide produces sedation and may produce extrapyramidal reactions, although these are comparatively rare," is inaccurate, false and misleading. The assertion that metoclopramide-induced extrapyramidal reactions are "comparatively rare" is without scientific evidence of any sort capable of supporting it.

k) The omission of any reference to epidemiological studies and other evidence suggesting that the prevalence of tardive dyskinesia among patients exposed to metoclopramide for six months or longer is as much as 100 times greater than 1 in 500.

l) The statement that use of metoclopramide products for longer than 12 weeks "had not been evaluated" and therefore "cannot" be recommended. The statement misleadingly implies that no evaluation whatever of longer term use has been undertaken, or that use for longer than 12 weeks would be recommended if only formal evaluations or clinical studies for such periods had been performed. The statement also misleadingly implies that the manufacturer is not permitted to recommend longer term use only because it has not done studies to establish efficacy for long term use.

m) The omission of any statement that therapy with metoclopramide products should not extend beyond three months. This omission implies, in context, that no scientific evidence suggests, or strongly suggests, that longer term use increases substantially the risks of overexposure.

84. Defendants, the DRUG COMPANY DEFENDANTS, MCKESSON, and

23

*Complaint for Damages*

1

2 DOES 1-100 had actual and/or constructive knowledge that pharmacists and consumers, like

3 Plaintiff, would rely upon the information disseminated to the patient, and that many

4 patients would be likely to ingest the PRODUCTS. Defendants, the DRUG COMPANY

5 DEFENDANTS, and DOES 1-100 knew, or should have known through exercise of the

reasonable care that the PRODUCT information they undertook to provide to dispensing
6
pharmacies and their consumers, including Plaintiff, substantially understated the prevalence
7
of acute and long-term side effects of ingesting the PRODUCTS and failed, and continue to
8
9 fail, to modify the PRODUCT information to adequately warn consumers and provide

accurate information about PRODUCT risks and benefits.
10

11 **Allegations of Fact regarding Plaintiffs**

12 85.     Between approximately March 2005 and March 2009, PLAINTIFF Patricia

13 Goss' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for

14 PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving

15 more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS

dispensed to Ms. Goss were manufactured or distributed by Defendants McKesson
16
Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd.,
17
PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis
18
Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.
19

20 86.     Between approximately September 2004 and February 2007, PLAINTIFF

21 Walter Rywkiewicz' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the

22 "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a

means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The
23
PRODUCTS dispensed to Mr. Rywkiewicz were manufactured or distributed by Defendants
24
McKesson Corporation, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals,
25
LLC, Purepac Pharmaceuticals and DOES 1 through 100.
26

27 87.     Between approximately 2000 and 2006, PLAINTIFF Nikki Wright's

28 physicians, prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for

24

*Complaint for Damages*

PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Wright were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC and DOES 1 through 100.

88.     Between approximately April 2007 and February 2009, the PLAINTIFF David Yoder's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Yoder were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC and DOES 1 through 100.

89.     Between approximately October 2004 and February 2010, PLAINTIFF Jeannine Zitney's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Goss were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC and DOES 1 through 100.

90.     Between approximately 1992 and March 2007, PLAINTIFF Hellen Amonds' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Amonds were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

91.     PLAINTIFF Christine Atkinson' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis for a period of time of sufficient duration to cause irreversible movement disorders consistent with tardive dyskinesia. The PRODUCTS dispensed to Ms. Atkinson were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

92.     Between approximately October 2005 and December 2005, PLAINTIFF Jerry Ault's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Ault were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

93.     Between approximately 2000 and April 16, 2009, PLAINTIFF Benito Balderas' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Balderas were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

94.     Between approximately February 2010 to April 2010, PLAINTIFF Kathy Baldwin physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS")

26

*Complaint for Damages*

for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Baldwin were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

95.     Between approximately about 1999 to 2010, PLAINTIFF Dale Beard' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Beard were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

96.     Between approximately 2004 and 2005, and again from late 2006 to present, PLAINTIFF Dominik Becker's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Becker were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

97.     Between approximately January 2002 to January 2004, PLAINTIFF Breanna Belcher's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The

27

*Complaint for Damages*

1
2
3
4
5

PRODUCTS dispensed to Ms. Belcher were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

6
7
8
9
10
11
12
13

98.      Between approximately February 26, 2008 to August 27, 2007, PLAINTIFF Donald Benton's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Benton were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

14
15
16
17
18
19
20
21
22

99.      During approximately the mid-1990s and again between approximately 2006 to present, PLAINTIFF Kathy Bingham's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis.   The PRODUCTS dispensed to Ms. Bingham were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

23
24
25
26
27
28

100.     Between approximately 2005 and 2010, PLAINTIFF George Bower's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis.  The PRODUCTS dispensed to Mr. Bower were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd.,

28

*Complaint for Damages*

PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

101.    Between approximately June 2007 and January 2010, PLAINTIFF Melody Brockhage's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Brockhage were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

102.    Between approximately January 1997 to June 1997, PLAINTIFF Pansy Browning's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Browning were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

103.    Between approximately 1995 to 2001, PLAINTIFF Elwin Bullard's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Bullard were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

104.    Between approximately 2005 and 2008, PLAINTIFF Elizabeth Bushart's

physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Bushart were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

105.     Between approximately 2004 and November 2009, PLAINTIFF Jeffrey Buskirk's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Buskirk were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

106.     Between approximately August 2001 to October 2007, PLAINTIFF Jodi Camarillo's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Camarillo were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

107.     Between approximately April 19, 2006 and October 14, 2008, PLAINTIFF Marcella Coles' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The

30

*Complaint for Damages*

1
2
3
4
5

PRODUCTS dispensed to Ms. Coles were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

6
7
8
9
10
11
12
13

108.    Between approximately 2002 and 2008, PLAINTIFF Max DeVoe's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. DeVoe were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

14
15
16
17
18
19
20
21

109.    Between approximately 2004 and 2009, PLAINTIFF Ingrid Dupuy's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Dupuy were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

22
23
24
25
26
27
28

110.    Between approximately 1996 and 1997, PLAINTIFF Dale Farmer's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Farmer were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis

31

*Complaint for Damages*

Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

111. Between approximately 1991 and February 2010, PLAINTIFF Joan Ferraro's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Ferraro were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

112. PLAINTIFF Clarice Glaze's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis for a period of time sufficient to cause irreversible movement disorders consistent with tardive dyskinesia. The PRODUCTS dispensed to Ms. Glaze were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

113. During 1989, PLAINTIFF Richard Grant II's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis for a period of time sufficient to cause irreversible movement disorders consistent with tardive dyskinesia. The PRODUCTS dispensed to Mr. Grant were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

114.    Between approximately February 9, 2004 and January 31, 2009, PLAINTIFF Jan Gray's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Gray were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

115.    Between approximately 2001 and 2008, PLAINTIFF Julia Greer's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Greer were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

116.    In approximately 2002 and then between approximately 2006 and 2007, PLAINTIFF Kimberly Hanson's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Hanson were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

117.    Between approximately February 2004 and May, 2009, PLAINTIFF Lynda Liem's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS")

33

*Complaint for Damages*

for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Liem were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

118.    Between approximately 1995 and June 2009, PLAINTIFF Gary Lutes' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Lutes were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

119.    Between approximately 2005 and October 2007, PLAINTIFF Samica Lynon's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Lynon were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

120.    Between approximately March 16, 2009 to May 30, 2009, PLAINTIFF William Massey's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Massey were manufactured or distributed by Defendants

McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

121.   Between approximately 1999 and 2010, PLAINTIFF Lovie Miller's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Miller were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

122.   Between approximately 2005 and February 6, 2010,, PLAINTIFF Sue Miniard's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Miniard were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

123.   Between approximately 2005 and 2008, PLAINTIFF Perry Moorer's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Moorer were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

124. Between approximately 2004 and 2007, PLAINTIFF Dorothy Mulkey's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Mulkey were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

125. Between approximately 2004 and 2007, PLAINTIFF Dorothy Mulkey's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Mulkey were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

126. Between approximately 1999 and August 2008, PLAINTIFF Karen Mullin's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Mullin's were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

127. Between approximately March 2007 and June 2008, PLAINTIFF Charles Nagy's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of

36

*Complaint for Damages*

relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Nagy were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

128.    Between approximately June 2008 and February 2009, PLAINTIFF Marlou Ordelt physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Ordelt were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

129.    Between approximately June 2007 and December 2008, PLAINTIFF Robert Pike physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Mr. Pike were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

130.    Between approximately August 4, 2004 and May 23, 2008, PLAINTIFF Patricia Richey's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Richey were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries,

Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

131.    Between approximately 2008 and 2010, PLAINTIFF Arlene Rogers' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Rogers were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

132.    Between approximately 2004 and 2October 2001 and July 22, 2005, PLAINTIFF Michelle Schwartz' physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis.    The PRODUCTS dispensed to Ms. Schwartz were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

133.    Between approximately 2006 and July 2008, PLAINTIFF Jana Smith's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Smith were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

*Complaint for Damages*

134. Between approximately March 2005 and January 2007, PLAINTIFF Stefanie Sodermark's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Sodermark were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

135. During approximately 2005, PLAINTIFF Lorraine Spencer's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Spencer were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

136. Between approximately September 2008 and September 2009, PLAINTIFF Betty Stuck's physicians prescribed "Reglan" and/or "metoclopramide" (i.e. the "PRODUCTS") for PLAINTIFF, on a more or less continuous and/or intermittent basis, as a means of relieving more or less chronic bloating and/or heartburn and/or gastroparesis. The PRODUCTS dispensed to Ms. Stuck were manufactured or distributed by Defendants McKesson Corporation, Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100.

137. In so prescribing the PRODUCTS for the PLAINTIFF, the PLAINTIFF's physician(s) foreseeably and reasonably relied upon the information published in the PDR or otherwise disseminated by WYETH (as the A. H. Robins Company and by other names), as

39
*Complaint for Damages*

the manufacturer/distributor of the name brand product REGLAN, and were not aware of information different from or contrary to the inaccurate, misleading, materially incomplete, false, and/or otherwise inadequate information thus disseminated.

138.    All else being equal, a physician's reliance on the information concerning the properties and effects of a drug or name brand prescription drug product as contained in the PDR monograph for that drug, and in other materials disseminated by the drug's manufacturer and/or distributor, is foreseeable and reasonable—and equally foreseeable and reasonable as to the properties and effects of therapeutically equivalent generic products.

139.    The Plaintiff's pharmacists filled the prescriptions with the PRODUCTS, namely metoclopramide tablets and/or metoclopramide syrup, as authorized or required by state law, including CA Business & Professions Code Section 4073 and similar so-called "drug product selection laws" enacted in every state.

140.    The PLAINTIFF took the PRODUCTS, as prescribed by Plaintiff's physicians and dispensed by PLAINTIFF's pharmacies, more or less continuously for the time period described above.

141.    Some of the PRODUCTS supplied to and ingested by the PLAINTIFF had been manufactured and/or distributed by Defendant Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., PLIVA, Inc., PLIVA d.d., Barr Pharmaceuticals LLC, Actavis Elizabeth LLC, Actavis Group hf, APP Pharmaceuticals, LLC, Purepac Pharmaceuticals and DOES 1 through 100 inclusive.

142.    The PLAINTIFF's use of the PRODUCTS, as prescribed by PLAINTIFF's physicians, resulted in PLAINTIFF's overexposure to the drug metoclopramide, which caused PLAINTIFF to suffer serious, permanent and disabling injuries, including but not limited to injuries of or associated with the central nervous and extrapyramidal motor systems, specifically tardive dyskinesia or other extrapyramidal movement disorders.

143.    As a direct and proximate result of defects in the PRODUCTS and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants,

1
2
3
4

Plaintiff has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment resulting permanent physical deficits, permanent impairment and other sequelae likely to continue manifesting in the future.

5
6
7
8
9

144.    As a further direct and proximate result of defects in the PRODUCTS and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff has required medical treatment, and will continue to require reasonable and necessary health care, attention and services, and incurred, and will continue to incur, medical, incidental, and service expenses pertaining to the injuries.

10
11
12
13
14

145.    As a further direct and proximate result of defects in the PRODUCTS and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff has also incurred medical expenses and other economic harm including but not to limited loss of earnings and loss of earning capacity, and will continue to incur expenses and loss of earnings in the future.

15
16
17
18
19
20
21

146.    The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff and other users of the PRODUCTS, and for the primary purpose of increasing Defendant's profits from the sale and distribution of the PRODUCTS. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

22
23
24
25
26
27
28

147.    Prior to the manufacturing, sale and distribution of the PRODUCTS, Defendants, and each of them, knew that the PRODUCTS were in a defective condition as previously described herein and knew that those who were prescribed the PRODUCTS would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants and each of them through their officers, directors, managers, and agents, had knowledge that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, consumers of the PRODUCTS were unreasonably

41

*Complaint for Damages*

1

subjected to risk of injury or death.

2

3    148.    Despite such knowledge, Defendants, and each of them, acting through their
4    officers, directors and managing agents for the purpose of enhancing Defendants' profits,
5    knowingly and deliberately failed to remedy the known defects in the PRODUCTS and
6    failed to warn the public, including the Plaintiff, prescribing physicians and healthcare
7    providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and
8    the public in general, of the extreme risk of injury occasioned by said defects inherent in the
9    PRODUCTS. Defendants and their individual agents, officers, and directors intentionally
10   proceeded with the manufacturing, sale, distribution and marketing of the PRODUCTS
11   knowing that the public, including Plaintiff would be exposed to serious danger in order to
12   advance Defendants' own pecuniary interest and monetary profits.

13   149.    Defendants' conduct was despicable, and so contemptible that it would be
14   looked down upon and despised by ordinary decent people, and was carried on by
15   Defendants with willful and conscious disregard for safety, entitling Plaintiff to exemplary
     damages under Civil Code § 3294.
16

17   150.    The acts, conduct, and omissions of Defendants, and each of them, as alleged
18   throughout this Complaint were fraudulent, willful and malicious and were done with a
19   conscious disregard for the rights of Plaintiff and other users of the PRODUCTS, and for the
20   primary purpose of increasing Defendant's profits from the sale and distribution of the
21   PRODUCTS. Defendants' outrageous and unconscionable conduct warrants an award of
22   exemplary and punitive damages against each Defendant in an amount appropriate to punish
23   and make an example of each Defendant.

24   151.    Plaintiff has reviewed the potential legal claims and causes of action against the
25   Defendants and has intentionally chosen only to pursue claims based on state-law. Any reference
26   to any federal agency, regulation or rule is stated solely as background information and does not
27   raise a federal question. Plaintiff has chosen to only pursue claims based on state-law and are not
28   making any claims that raise federal questions. Defendant McKesson Corporation as distributor

of the PRODUCTS is California resident corporation with their principal place of business in California and the liability herein of each is so intertwined with the liability of the other Defendants herein that no claims arising out of use of the PRODUCTS can be severed or removed. Accordingly, Plaintiff contends that California State jurisdiction and venue is proper.

### Jurisdiction

152. This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

153. There is complete diversity of citizenship between the Plaintiffs and Defendants. This Coourt has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00 for each plaintiff and because there is complete diversity of citizenship between Plaintiffs and Defendants.

154. Venue is proper in this United States Judicial District pursuant to 28 U.S.C. A.§ 1391. Defendants marketed, advertised and distributed the dangerous PRODUCTS in the district, thereby receiving substantial financial benefit and profits from the PRODUCTS in this district and one or more of the Defendants reside in this district pursuant to 28 U.S.C.A. § 1391 (c), such that venue is proper.

155. At all relevant times herein, Defendants were in the business of designing, marketing, distributing, promoting, and disseminating inaccurate, false and misleading information about the dangerous PRODUCT in inter-state commerce (including California). Defendants do substantial business in California and within this Federal Judicial District, advertise in this district and receive compensation and profits from sales of the PRODUCT in this judicial district, and made material omissions and misrepresentations about the PRODUCT in this District so as to subject them to *in personam* in this Judicial District. In engaging in the conduct alleged herein each Defendant acted as the agent for each of the other Defendants, or those Defendants' predecessor(s) in interest.

156. Plaintiff Hellen Amonds at all times relevant herein was a resident of Smyrna, Georgia.

43

*Complaint for Damages*

157. Plaintiff Christine Atkinson is now, and at all times relevant herein was, a resident of South Haven, Michigan.

158. Plaintiff Jerry Ault is now, and at all times relevant herein was, a resident of Muncie, Indiana.

159. Plaintiff Benito Balderas is now, and at all times relevant herein was, a resident of Hale Center, Texas.

160. Plaintiff Kathy Baldwin is now, and at all times relevant herein was, a resident of Flemington, Missouri.

161. Plaintiff Amy Beard, as guardian of Dale Keith Beard Jr. is now, and at all times relevant herein was, a resident of Union, South Carolina.

162. Plaintiff Kristina Becker, as guardian of Dominik Becker, is now, and at all times relevant herein was, a resident of Kent, Washington.

163. Plaintiff Kandie Laferty, as guardian for Breanna Belcher, is now, and at all times relevant herein was, a resident of Dundas, Ohio.

164. Plaintiff Donald Benton is now, and at all times relevant herein was, a resident of Norton, Ohio.

165. Plaintiff Kathy Bingham is now, and at all times relevant herein was, a resident of Kingman, Arizona.

166. Plaintiff George Bower is now, and at all times relevant herein was, a resident of Rockford, Illinois.

167. Plaintiff Melody Brockhage is now, and at all times relevant herein was, a resident of Bettendorf, Iowa.

168. Plaintiff Pansy Browning is now, and at all times relevant herein was, a resident of Kokomo, Indiana.

169. Plaintiff Elwin Bullard is now, and at all times relevant herein was, a resident of Farmers Branch, Texas.

170.     Plaintiff Elizabeth Bushart is now, and at all times relevant herein was, a resident of Whitefish, Montana.

171.     Plaintiff Jeffrey Buskirk is now, and at all times relevant herein was, a resident of Reno, Nevada.

172.     Plaintiff Jodi Camarillo is now, and at all times relevant herein was, a resident of Lakewood, Colorado.

173.     Plaintiff Marcella Coles is now, and at all times relevant herein was, a resident of Newport News, Virginia.

174.     Plaintiff Linda Conley is now, and at all times relevant herein was, a resident of Owosso, Michigan.

175.     Plaintiff Max DeVoe is now, and at all times relevant herein was, a resident of Albany, Indiana.

176.     Plaintiff Ingrid Dupuy is now, and at all times relevant herein was, a resident of Hartford, Connecticut.

177.     Plaintiff Dale Farmer is now, and at all times relevant herein was, a resident of Colorado Springs, Colorado.

178.     Plaintiff Joan Ferraro is now, and at all times relevant herein was, a resident of Staten Island, New York.

179.     Plaintiff Clarice Glaze is now, and at all times relevant herein was, a resident of Omaha, Nebraska

180     Plaintiff Patricia Goss is now, and at all times relevant herein was, a resident of Kingsland, Texas.

181.     Plaintiff Richard Grant II is now, and at all times relevant herein was, a resident of Indianapolis, Indiana.

182.     Plaintiff Jan Gray is now, and at all times relevant herein was, a resident of Bellingham, Washington.

45

*Complaint for Damages*

183.    Plaintiff Julia Greer is now, and at all times relevant herein was, a resident of Faulkner, Maryland.

184.    Plaintiff Kimberly Hanson is now, and at all times relevant herein was, a resident of Fort Dodge, Iowa.

185.    Plaintiff Lynda Liem is now, and at all times relevant herein was, a resident of Glendale, Arizona.

186.    Plaintiff Gary Lutes is now, and at all times relevant herein was, a resident of Rockford, Illinois.

187.    Plaintiff Samica Lynon at all times relevant herein was a resident of Merrillville, Indiana.

188.    Plaintiff William Massey is now, and at all times relevant herein was, a resident of Commerce, Georgia.

189.    Plaintiff Lovie Miller is now, and at all times relevant herein was, a resident of Warner Robins, Georgia.

190.    Plaintiff Sue Miniard at all times relevant herein was a resident of Bledsoe, Kentucky.

191.    Plaintiff Perry Moorer is now, and at all times relevant herein was, a resident of Columbus, Ohio.

192.    Plaintiff Dorothy Mulkey is now, and at all times relevant herein was, a resident of Carthage, Missouri.

193.    Plaintiff Karen Mullins is now, and at all times relevant herein was, a resident of Jenks, Oklahoma.

194.    Plaintiff Charles Nagy is now, and at all times relevant herein was, a resident of Greensburg, Pennsylvania.

195.    Plaintiff Marlou Ordelt is now, and at all times relevant herein was, a resident of Pocono Pines, Pennsylvania

46

*Complaint for Damages*

196. Plaintiff Robert Pike is now, and at all times relevant herein was, a resident of Holtom City, Texas.

197. Plaintiff Patricia Richey is now, and at all times relevant herein was, a resident of Sunfield, Michigan.

198. Plaintiff Arlene Rogers is now, and at all times relevant herein was, a resident of Martinsburg, West Virginia.

199. Plaintiff Michelle Schwartz is now, and at all times relevant herein was, a resident of Merrick, New York.

200. Plaintiff Jana Smith is now, and at all times relevant herein was, a resident of Bridge Port, Texas.

201. Plaintiff Stefanie Sodermark is now, and at all times relevant herein was, a resident of Machesney Park, Illinois.

202. Plaintiff Lorraine Spencer is now, and at all times relevant herein was, a resident of Redmond, Oregon.

203. Plaintiff Betty Struck at all times relevant herein was a resident of Golden, Colorado

204. Plaintiff Nikki Wright is now, and at all times relevant herein was, a resident of Aumesville, Oregon

205. Plaintiff David Yoder is now, and at all times relevant herein was, a resident of Danvers, Illinois.

206. At all times relevant hereto, DRUG COMPANY DEFENDANTS, MCKESSON, and DOES 1-100 inclusive, were in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising the PRODUCTS in the State of California and the County of San Francisco.

207. At all times relevant hereto, DRUG COMPANY DEFENDANTS, MCKESSON, and DOES 1-100 inclusive, had offices in California and/or regularly solicited and transacted

*Complaint for Damages*

business in the State of California and the County of San Francisco. DRUG COMPANY DEFENDANTS, MCKESSON, and DOES 1-100 inclusive, carried on a continuous and systematic part of their business in California and San Francisco County. In addition, DRUG COMPANY DEFENDANTS, MCKESSON, and DOES 1-100 inclusive, reasonably expected that the PRODUCTS, would be used or consumed in California and San Francisco County.

208.    Defendants McKesson Corporation and Northstar Rx LLC were and are residents of California because their principal places of business are in San Francisco, California.

209.    Defendant Barr Pharmaceuticals LLC, Duramed Pharmaceuticals Inc., and PLIVA USA, Inc., were and are residents of California because their principal place of business was and is in Irvine, California.

210.    Defendants, Rugby Pharmaceuticals, Inc. a/k/a Rugby Laboratories, Inc. and Defendant Watson Laboratories, Inc., were and are residents of California because their principal place of business was and is in Corona, California.

211.    Plaintiffs have each timely filed this lawsuit within two years of discovering accrual of their claim.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

212.    Plaintiff files this lawsuit within two years of first suspecting that said PRODUCTS were the cause of any appreciable harm. Plaintiff could not by the exercise or reasonable diligence, have discovered the wrongful cause of the injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when the injuries were discovered their cause was unknown to Plaintiff. Plaintiff did not know or suspect, nor did Plaintiff have reason to know or suspect, the injury, the cause of the injury, or the tortious nature of the conduct causing injury, until less than two years prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that the PRODUCTS are safe and free from serious side effects, and Defendants

have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

213.  More specifically, Plaintiff first discovered the causes of action against these Defendants on or about Spring, 2009 when Plaintiff first saw an advertisement and learned that the PRODUCTS could cause injuries of the type suffered by Plaintiff. After becoming aware of the injuries, Plaintiff had conducted a reasonable investigation but obtained no actual or constructive knowledge regarding the cause of the injuries, nor that had the injuries been caused by the wrongdoing of another. Plaintiff acted with reasonable diligence in discovering the causes of action against these Defendants, and Plaintiff was unable to have made earlier discovery despite such diligence, in that, inter alia, the injuries occurred over time and without immediately perceptible trauma, and Plaintiff and Plaintiff's healthcare providers relied upon misrepresentations by Defendants to the public, the medical community, and prescribing physicians that all material information relating to the nature and extent of known and knowable risks of side effects associated with the PRODUCTS had been conveyed by the Defendants to the public and the medical community, when in fact, as set forth above, such information had not been conveyed and was withheld by Defendants. Moreover, Plaintiff was unaware that the Defendants had fraudulently concealed information in their possession regarding the true nature of the risks, and fraudulently concealed facts and information that could have led Plaintiff to discover the causes of action at an earlier time.

## FIRST CAUSE OF ACTION

## STRICT PRODUCT LIABILITY - FAILURE–TO–WARN

**(as to each Defendant who manufactured or distributed a product ingested by Plaintiff)**

214.  Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

215.  The PRODUCTS were defective at the time of their manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution in that, and not

by way of limitation, the PRODUCTS' warnings, instructions and directions failed to warn of the dangerous risks posed by the PRODUCTS, including increased dangerous propensities as compared to other similar and comparable alternatives, which risks were known or reasonably scientifically knowable to Defendants. The Defendants, and each of them, knew or should have known of the defective condition, characteristics and risks associated with the PRODUCTS, as previously set forth herein.

216.    At all times herein alleged, the PRODUCTS were defective and Defendants, and each of them, knew that the PRODUCTS were to be used by consumers without inspection for defects therein. Moreover, the Plaintiff, prescribing physicians and health care providers, neither knew, nor had reason to know at the time of their use of the PRODUCTS of the existence of the aforementioned defects.  Ordinary consumers would not have recognized the potential risks or side effects for which Defendants failed to include appropriate warnings.

217.    At all times herein mentioned, the PRODUCTS were prescribed and used as intended by Defendants and in a manner reasonably foreseeable to DEFENDANTS

218.    The dangerous propensities of the PRODUCTS as referenced above, were known to DEFENDANTS, or scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold their respective products, and not known to ordinary physicians who would be expected to prescribe the PRODUCTS for their patients

219.    The PRODUCTS (including Reglan), as distributed by DEFENDANTS, were defective and unreasonably dangerous prescription drug products, inasmuch as the defendants failed to provide warnings and instructions that were appropriate and adequate to render the PRODUCTS reasonably safe for their ordinary, intended, and reasonably foreseeable uses, in particular the common, foreseeable, and intended use of the products for long term metoclopramide therapy. Specifically, DEFENDANTS, knowing or culpably ignorance of the inadequacy of the information disseminated to doctors by co-defendant WYETH, failed utterly to communicate any warnings or instructions at all concerning their products to doctors (or

their patients). Rather than disseminating product information in a manner reasonably calculated to be seen and read by doctors (or patients), these defendants disseminated such information (namely the information contained in each product's "package inserts") only on or within containers from which the products were to be dispensed by pharmacies to consumers.

220.    As a foreseeable and proximate result of these defects, as described, in the metoclopramide products which Plaintiff ingested, and which had been manufactured, supplied, and/or sold in that defective condition by DEFNDANTS, the Plaintiff suffered grievous bodily injuries and consequent economic and other losses, as referenced above, when Plaintiff's physicians, lacking adequate warnings and other appropriate facts that were misrepresented or omitted from the information (if any) the defendants provided to physicians for their respective products, prescribed for the Plaintiff the use of the PRODUCTS for a prolonged and unwarranted period of time and she ingested, per those prescriptions, the PRODUCTS manufactured by these defendants, leading to Plaintiff's toxic overexposure to the PRODUCTS.

221.    At all times herein alleged, the PRODUCTS were defective and DEFENDANTS, and each of them, knew that the PRODUCTS were to be used by consumers without inspection for defects therein. Moreover, the Plaintiff, prescribing physicians and health care providers, neither knew, nor had reason to know at the time of the use of the PRODUCTS of the existence of the aforementioned defects.  Ordinary consumers would not have recognized the potential risks or side effects for which DEFENDANTS failed to include appropriate warnings.

222.    At all times herein mentioned, the metoclopramide products were prescribed and used as intended by DEFENDANTS and in a manner reasonably foreseeable to DEFENDANTS.

223.    As a result of the defective condition of the metoclopramide products, namely the lack of sufficient warnings, Plaintiff suffered the injuries and damages as alleged herein.

51

*Complaint for Damages*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CAUSE OF ACTION

### NEGLIGENCE

**(as to each Defendant who manufactured or distributed a product ingested by Plaintiff).**

224.    Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

225.    At all times relevant hereto, DEFENDANTS, and each of them, had a duty to properly manufacture, design, formulate, distribute, compound, produce, process, assemble, test, inspect, research, market, label, package, prepare for use, issue warnings with respect to, promote, advertise, sell and monitor the use of the PRODUCTS, and to adequately test and warn of the risks and dangers of the PRODUCTS, both before and after sale.

226.    At all times relevant hereto, DEFENDANTS, and each of them, breached their duties in that they negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, tested (including testing for the effects of long term use), inspected, researched, marketed, labeled, packaged, prepared for use, issued warnings with respect to, promoted, advertised, sold and monitored the use of the PRODUCTS, and failed to adequately test and warn of the risks and dangers of the PRODUCTS, both before and after their sale.

227.    DEFENDANTS, and each of them, also breached the duties each owed to exercise reasonable care for the safety of potential users of their products, including the PLAINTIFF, by negligently failing to disseminate, in a manner reasonably calculated to be seen and read by physicians (or patients), information concerning their respective products' effects which was accurate, non-misleading, and otherwise adequate to enable to physicians (or patients) to make informed choices concerning the reasonably safe use of the products. Specifically:

a)    DEFENDANTS knowing or negligent ignorance of the inadequacy of the information disseminated to doctors by co-defendant WYETH, negligently

52

*Complaint for Damages*

failed utterly to communicate any warnings or instructions at all concerning its metoclopramide product to doctors (or patients). Rather than disseminating product information in a manner reasonably calculated to be seen and read by doctors (or patients), these DEFENDANTS disseminated such information, namely the information contained in each product's "package inserts," only on or within containers from which the products were to be dispensed by pharmacies to consumers.

b) Alternatively, the DEFENDANTS' knowing or negligent ignorance of the inadequacy of the information WYETH disseminated to doctors, negligently relied solely on co-defendants WYETH and SCHWARZ and ALAVEN to have communicated appropriate information to doctors about Reglan, and thereby to have communicated to doctors appropriate information about their own materially identical products. The information contained in their products' package inserts, which were not distributed in a manner reasonably calculated to be seen or read by physicians (or their patients), contained (in any event) no additional material information at all.

228. As a foreseeable and proximate result of these breaches by DEFENDANTS, Plaintiff suffered the injuries and damages as alleged herein. Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

## THIRD CAUSE OF ACTION –

## FRAUD

### (as to Defendant WYETH only)

229. Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

230. WYETH , individually and as A.H. Robins Company, Inc. prior to its merger into

*Complaint for Damages*

a wholly owned subsidiary of WYETH, disseminated the false information, as referenced above, to physicians (and, indirectly, to their patients) knowing the information to be false or in conscious disregard of whether it was false or not false, with the intention to deceive the physicians (and, indirectly, their patients) and to induce the physicians to prescribe Reglan, and in particular to prescribe Reglan for prolonged periods of time, with the knowledge that the patients were likely to ingest other, materially identical metoclopramide products (namely, generic metoclopramide) in addition to or in place of Reglan

231.    WYETH, individually and as A.H. Robins Company, Inc. prior to its merger into a wholly owned subsidiary of WYETH, made other representations about the safety of Reglan and its allegedly minimal side effects, all as explained above and incorporated here by reference.

232.    The representations made by WYETH, individually and as A.H. Robins Company, Inc. prior to its merger into a wholly owned subsidiary of WYETH, were, in fact, false. The true facts were that Reglan and subsequently generic metoclopramide products caused a variety of extrapyramidal and movement disorder side effects, among other side effects after prolonged periods of use far more commonly than represented by WYETH, individually and as A.H. Robins Company, Inc. prior to and after its merger into a wholly owned subsidairary of WYETH.

233.    WYETH, individually and as A.H. Robins Company, Inc. prior to its merger into a wholly owned subsidiary of WYETH, misrepresented the safety of Reglan, represented that the product marketed was safe for long term use, represented that extrapyramidal reactions were comparatively rare, represented that the most common type of extrapyramidal reactions were acute dystonic reactions when it knew that was not true, represented that acute dystonic reactions occurred in 1 in 500 patients when it knew that was not true and concealed warnings of the known or knowable risks and side effects of Reglan.

234.    When WYETH, individually and as A.H. Robins Company, Inc. prior to its merger into a wholly owned subsidiary of WYETH, made these representations, Defendant knew that such representations were false. WYETH, individually and as A.H. Robins Company, Inc. prior to its merger into a wholly owned subsidiary of WYETH, made the representations

with the intent to defraud and deceive the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general, and with the intent to induce them to use the products and act in the manner alleged in this complaint.

235.    The Plaintiff, and prescribing physicians and healthcare providers took the actions alleged in this complaint, while ignorant of the falsity of the representations and reasonably believed them to be true. In reliance upon such representations, they were induced to, and did, use Reglan and the subsequent metoclopramide products as described in this complaint. If they had known the actual facts, they would not have taken such actions nor used the Reglan or subsequent metoclopramide products, and their reliance upon WYETH's misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

236.    As a foreseeable and proximate result of this knowing dissemination of knowingly and/or recklessly false information, as referenced above, the Plaintiff suffered grievous bodily injury and consequent economic and other loss, as described above, when Plaintiff's physicians, in foreseeable and reasonable reliance upon this false information disseminated by WYETH, and reasonably but unjustifiably believing the information to be true, prescribed for the Plaintiff the use of the PRODUCTS for a prolonged and unwarranted period of time, and Plaintiff ingested, per those prescriptions, the PRODUCTS, leading to Plaintiff's toxic overexposure to metoclopramide.

237.    As a direct and proximate result of WYETH's fraud and deceit, Plaintiff sustained the injuries and damages described in this complaint.

## FOURTH CAUSE OF ACTION

## DECEIT BY CONCEALMENT

### (as to Defendant WYETH)

238.    Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

*Complaint for Damages*

239.    Defendant WYETH, from the time that the PRODUCTS was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, wilfully deceived the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general, by concealing from them, the true facts concerning the Reglan and/or other metoclopramide products, which the WYETH had a duty to disclose.

240.    At all times relevant hereto, WYETH, conducted a sales and marketing campaign to promote the sale of the PRODUCTS and wilfully deceived the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general as to the health risks and consequences of the use of the PRODUCTS. WYETH was aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for human consumption. Furthermore, WYETH was aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS have a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered as described herein.

241.    At all times relevant hereto, WYETH, conducted a sales and marketing campaign to promote the sale of the PRODUCTS and wilfully deceived the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general as to the health risks and consequences of the use of the PRODUCTS. WYETH was aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for human consumption. Furthermore, WYETH was aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS have a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered as described herein.

242.    WYETH intentionally concealed and suppressed the true facts concerning the PRODUCTS with the intent to defraud the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in

*Complaint for Damages*

general, in that WYETH knew that the physicians and healthcare providers would not have prescribed the PRODUCTS, and Plaintiff would not have used the PRODUCTS if they had known the true facts concerning the dangers of the PRODUCTS.

243. As a result of the foregoing fraudulent and deceitful conduct by WYETH Plaintiff suffered injuries and damages as described above.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (as to Defendant WYETH)

244. Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

245. Defendant WYETH owed a duty in all of its several undertakings, including the dissemination of information concerning Reglan and metoclopramide, to exercise reasonable care to ensure that they did not, in those undertakings, create unreasonable risks of personal injury to others.

246. Defendant WYETH disseminated to physicians, through the publication of a PDR monograph and otherwise, information concerning the properties and effects of metoclopramide and Reglan, with the intention and expectation that physicians would rely upon that information in their decisions concerning the prescription of drug therapy for their patients

247. It is the public policy of the United States and of this state, as reflected in the Hatch-Waxman Act and in CA Business & Professions Code Section 4073 to encourage the availability of cheaper, generic drug products that are therapeutically equivalent to name brand products and to encourage the substitution, as appropriate, of such generic products for name brand products in patients' medical therapy.

248. Defendant WYETH, as a prescription drug manufacturer and/or distributor, knew or ought to have realized that so-called "drug product selection laws," enacted in every state,

including this state (see CA Business & Professions Code Section 4073), authorize or require a prescription for a drug identified by product brand name or by generic name to be filled, subject to certain limited exceptions, with a generic drug product that is therapeutically equivalent to the name brand drug product.

249.    Defendant WYETH, as a prescription drug manufacturer and/or distributor, knew or ought to have realized that the manufacturers and/or distributors of generic products, as a custom, typically and simply copy verbatim, for those package inserts, the therapeutically relevant content of the package insert for the name brand prescription drug product, for which the generic products are therapeutic equivalents; and, further, that the manufacturers of the counterpart generic products typically rely upon the marketing efforts of the name brand manufacturer to generate sales of their own products.

250.    Defendant WYETH, as a prescription drug manufacturer and/or distributor, knew or ought to have realized that physicians, to obtain basic information about the properties and effects of a drug or drug product that is available in both name brand and generic formulations, commonly and typically consult the information disseminated by the manufacturer/distributor of name brand product, in PDR monographs or otherwise, and rely upon that information in their decisions concerning the prescribing of those products for their patients, whether by brand name or generic name, and that the patients are likely to receive and ingest, per those prescriptions, one or more generic products that are therapeutically equivalent to the name brand product.

251.    Defendant WYETH, as a prescription drug manufacturer and/or distributor, knew or ought to have realized, specifically, that physicians, in weighing the potential benefits and potential risks of using metoclopramide products, whether name brand or generic or either, and in writing prescriptions for either "Reglan" or "metoclopramide," would rely upon information disseminated to them by the manufacturer of the name brand drug product, regardless of whether the prescriptions might be filled with either the name brand product, Reglan, or generic metoclopramide products, and that many patients, in accordance with those prescriptions, would be likely to ingest generic metoclopramide products as lawfully and properly dispensed by their

58

*Complaint for Damages*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

pharmacies.

252. Defendant WYETH, as a prescription drug manufacturer and/or distributor, knew or ought to have realized that patients receiving prescriptions for Reglan or generic metoclopramide written in reliance upon information that it disseminated as the manufacturer/distributor of Reglan, the name brand metoclopramide product, would be placed in peril of grievous personal injury if the information thus disseminated and relied upon was materially inaccurate, misleading, or otherwise false.

253. Defendant WYETH failed to exercise reasonable care to ensure that the information it disseminated to physicians concerning the properties and effects of Reglan (and of metoclopramide) was accurate and not misleading, and as a result disseminated information to physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as the PLAINTIFF, whether ultimately they purchased and ingested Reglan, generic metoclopramide products, or both.

254. As a proximate and foreseeable result of this negligence, the PLAINTIFF suffered grievous bodily injury and consequent economic and other loss, as described above, when Plaintiff's physicians, in reasonable reliance upon the negligently inaccurate, misleading, and otherwise false information disseminated by WYETH, and reasonably but unjustifiably believing the information to be true, prescribed for the PLAINTIFF the use of Reglan and/or metoclopramide products for a prolonged and unwarranted period of time and he ingested, per those prescriptions, metoclopramide products, leading to Plaintiff's toxic overexposure to metoclopramide.

255. As a direct result of WYETH's negligent misrepresentation, Plaintiff suffered injuries and damages as described above.

## SIXTH CAUSE OF ACTION –

## BREACH OF IMPLIED WARRANTY

**(as to each Defendant who manufactured or distributed a product ingested by Plaintiff)**

256. Plaintiff realleges and incorporates herein by reference each of the foregoing

59

*Complaint for Damages*

paragraphs of this Complaint as though fully set forth herein.

257.   Prior to the use of the PRODUCTS, Defendants, and each of them, impliedly warranted the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general, that the PRODUCTS were of merchantable quality and safe and fit for the use for which they were intended.

258.   Plaintiff, and physicians and healthcare providers were, and remain, unskilled in the research, design, and manufacture of the PRODUCTS and reasonably relied entirely on the skill, judgment, and implied warranty of Defendants in using the aforementioned PRODUCTS.

259.   The Defendants breached their warranties in that, the PRODUCTS were neither safe for their intended use nor of merchantable quality, as warranted by Defendants. in that the PRODUCTS had dangerous propensities and known or knowable side effects when put to its intended use and would cause severe injuries to the user, which propensities and side effects were known or knowable but were not warned of by the Defendants

260.   The Defendants breached their warranties in that, the PRODUCTS were neither safe for their intended use nor of merchantable quality, as warranted by Defendants, in that the PRODUCTS had dangerous propensities and known or knowable side effects when put to its intended use and would cause severe injuries to the user, which propensities and side effects were known or knowable but were not warned of by the Defendants.

261.   As a result of the aforementioned breach of implied warranties by Defendants and each of them, Plaintiff suffered injuries and damages as alleged herein.

## SEVENTH CAUSE OF ACTION –

## BREACH OF EXPRESS WARRANTY

**(as to each Defendant who manufactured or distributed a product ingested by Plaintiff)**

262.   Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

263.   At all times herein alleged, DEFENDANTS, and each of them, expressly

60

*Complaint for Damages*

represented and warranted to the Plaintiff, prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general, by and through statements made by Defendants, their authorized agents, and sales representatives, orally and in publications, package inserts, and other written materials intended for physicians, patients, and the general public, that the PRODUCTS were safe, effective, fit, and proper for their intended use, and the PRODUCTS were purchased in reliance upon said express warranties.

264. In using the PRODUCTS, the Plaintiff, and prescribing physicians and healthcare providers, relied on the skill, judgment, representations, and express warranties of BRAND NAME DEFENDANTS and GENERIC DEFENDANTS. Said warranties and representations were false in that the PRODUCTS were not safe and were unfit for the use for which they were intended.

265. As a result of the foregoing breach of express warranties by BRAND NAME DEFENDANTS and GENERIC DEFENDANTS, and each of them, Plaintiff sustained injuries and damages as described above.

## EIGHTH CAUSE OF ACTION –

## Violation of Bus. & Prof. Code 17200

**(as to each Defendant who manufactured or distributed a product ingested by Plaintiff)**

266. Plaintiff realleges and incorporates herein by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

267. Plaintiff brings this cause of action pursuant to California Business & Professions Code § 17204.

268. California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising".

269. The acts and practices described above were and are likely to mislead the general public and therefore constitute unfair business practices within the meaning of California

61

*Complaint for Damages*

1
2   Business & Professions Code § 17200. The acts of untrue and misleading advertising set forth in

3   presiding paragraphs are incorporated by reference and are, by definition, violations of California

4   Business & Professions Code § 17200. This conduct includes, but is not limited to:

5     a) Representing that the PRODUCTS were safe, fit, and effective for

6       human consumption, knowing that said representations were false, and

7       concealing that the PRODUCTS have a serious propensity to cause

8       injuries to users;

9     b) Engaging in advertising programs designed to create the image,

10       impression and belief by consumers and physicians that the use of the

11       PRODUCTS are safe for human consumption, have fewer side effects

12       and adverse reactions than other methods of birth control, constitute a

13       convenient, safe form of contraception and will not interfere with daily

14       life, even though the Defendants knew these to be false, and even

15       though the Defendants had no reasonable grounds to believe them to be

16       true;

17     c) Purposely downplaying and understating the health hazards and risks

18       associated with the PRODUCTS;

19     d) Issuing promotional literature and commercials deceiving potential

20       users of the PRODUCTS by relaying positive information, including

21       testimonials from satisfied users, and manipulating statistics to suggest

22       widespread acceptability, while downplaying the known adverse and

23       serious health effects and concealing material relevant information

24       regarding the safety of the PRODUCTS.

25  270. These practices constitute unlawful, unfair and fraudulent business acts or

26   practices, within the meaning of California Business & Professions Code § 17200, as well as

27   unfair, deceptive, untrue and misleading advertising as prohibited by California Business &
    Professions Code § 17500.

28

62

*Complaint for Damages*

271.   The unlawful, unfair and fraudulent business practices of Defendants described above present a continuing threat to members of the public in that Defendants continue to engage in the conduct described therein.

272.   As a result of their conduct described above, Defendants have been and will be unjustly enriched.  Specifically, Defendants have been unjustly enriched by receipt of hundreds of millions of dollars in ill-gotten gains from the sale and prescription of the PRODUCTS in California, sold in large part as a result of the acts and omissions described herein.

273.   Plaintiff, pursuant to California Business & Professions Code § 17203, seeks an order of this court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff prays for judgment against Defendants, jointly and severally, and as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff as follows:

1.   Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

2.   Past and future economic and special damages according to proof at the time of trial;

3.   Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.   Medical expenses, past and future, according to proof at the time of trial;

5.   For past and future mental and emotional distress, according to proof;

6.   Punitive or exemplary damages according to proof at the time of trial;

7.   Restitution and other equitable relief;

8.   Injunctive relief;

63

*Complaint for Damages*

9.      Attorney's fees;

10.     For costs of suit incurred herein;

11.     For pre-judgment interest as provided by law; and

12.     For such other and further relief as the Court may deem just and proper.

Dated: February 28, 2011                    LAW OFFICE OF LAURENCE O. MASSON


                                            Laurence O. Masson
                                            2625 Alcatraz Avenue, # 206
                                            Berkeley, California 94705-2702
                                            Telephone: 510.735.9691
                                            Facsimile:  510.735.9693

                                            lomlex@gmail.com

                                            **MEDICAL LEGAL CONSULTANTS OF
                                            WASHINGTON**
                                            Ralph D. Pittle, Esq.
                                            8201 164th Ave. NE, Ste. 200
                                            Redmond, WA 98052
                                            Tel: (800) 767-2403
                                            Fax: (888) 788-0568
                                            rpittle@mlcofwa.com

                                            Attorneys for Plaintiffs


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this Complaint.

Dated: February 28, 2011                    LAW OFFICE OF LAURENCE O. MASSON


                                            Laurence O. Masson, Esq.
                                            Attorneys for Plaintiffs

*Complaint for Damages*